IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Michael Sheppard, | ) | No. CIV 04-501-TUC-JMR (HCE) |
| Plaintiff, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Jo Anne B. Barnhart, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff Michael Sheppard has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  On September 20, 2004, this Social Security Appeal was referred to Magistrate Judge Nancy Fiora pursuant to the Rules of Practice of this Court.  On July 8, 2005, this matter was referred to the undersigned Magistrate Judge in light of Judge Fiora's retirement.

Pending before the Court are Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment.  Although Plaintiff's Motion is captioned "Motion for Summary Judgment," Plaintiff does not request judgment in his favor.  Instead, he requests that the Court remand the action to the ALJ for a new hearing.  Therefore, Plaintiff's Motion for Summary Judgment is construed as a Motion to Remand.

For the following reasons, the Magistrate Judge recommends that the District Court, after its independent review, grant Plaintiff's Motion for Summary Judgment, which has been construed as a Motion to Remand, and deny Defendant's Cross-Motion for Summary Judgment.

## I.    PROCEDURAL HISTORY

On April 17, 2002, Plaintiff submitted to the Social Security Administration (hereinafter SSA) an application for disability insurance benefits.  (TR. 14, 52-54)   In his Disability Report, Plaintiff indicated that he was disabled due to Posttraumatic Stress Disorder[1] (hereinafter PTSD), plantar fibromatosis, and loose right eye.  (TR. 58)  Plaintiff alleged a disability onset date of December 1, 1992.  (TR. 52)  His disability insurance status expired on December 31, 1992.  (TR. 20, 55)

Plaintiff's application was initially denied on the ground that there was insufficient evidence to show that Plaintiff was disabled on or before the date that he was last insured for Social Security Benefits, i.e., December 31, 1992.  (TR. 20) In rendering this decision, the SSA stated: "we requested records from the time you said your condition stopped you from working which was 12/01/92 to 12/31/92 the date you were last insured for social security benefits but you were unable to obtain them.  Since we do not have sufficient records, we therefore cannot find you disabled." (Id.)   Plaintiff filed a request for reconsideration of the

---

[1]"The essential feature of Posttraumatic Stress Disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death, or serious injury,..." or witnessing same.  (TR. 87 (setting out text from *Diagnostic and Statistical Manual of Mental Disorders,* (Fourth edition, 1994)) "Traumatic events that are experienced directly include, but are not limited to, military combat,....Stimuli associated with the trauma are persistently avoided.  The person commonly makes deliberate efforts to avoid thoughts, feelings, conversations about the traumatic event....The individual may complain of having markedly diminished interest or participation in previously enjoyed activities..., of feeling detached or estranged from other people....The individual has persistent symptoms of anxiety or increased arousal that were not present before the trauma.  These symptoms may include difficulty falling or staying asleep that may be due to recurrent nightmares during which the traumatic event is relived..., hyper-vigilance...and exaggerated startle response. Some individuals report irritability or outbursts or anger...or difficulty concentrating or completing tasks."  (TR. 87-88)

denial.  (TR. 24) Upon receipt of Plaintiff's request for reconsideration, the SSA again denied Plaintiff's claim on the ground that there was insufficient evidence showing that the Plaintiff's condition rendered him disabled as of December 31, 1992.  (TR. 27-30)

Plaintiff, who was not represented by counsel at the time, requested a hearing before an Administrative Law Judge and he indicated on three separate forms that he did not want to appear at the hearing in person; instead, he "want[ed] to have [his] case decided on the written evidence." (TR 50, 51.  *See also* TR. 31-33) Plaintiff stated that he did not wish to appear at the hearing because: "[o]f my panic disorder and anxiety attacks, being around crowds of people and being closed in.  I am better at night than I am in the daytime." (TR. 51; see also TR. 31 (waiving appearance and stating: "I have a panic disorder and anxiety attacks.  I cannot go out of the house some days. The Veterans Administration states I can't work.");TR. 50 (waiving appearance without indicating reason))

Administrative Law Judge (hereinafter ALJ) Lauren R. Mathon considered the evidence in the record without an oral hearing and, on August 19, 2003, rendered her decision denying Plaintiff's claim for benefits.  (TR. 14-17)

Plaintiff requested that the Appeals Council review the ALJ's decision.  (TR. 9) On July 26, 2004, the Appeals Council denied Plaintiff's request for review thereby rendering the ALJ's decision the final decision of the Commissioner.  (TR. 3-5)

II.      THE RECORD ON APPEAL

A.      General background regarding Plaintiff and Plaintiff's statements in the record

Plaintiff was born on April 20, 1949.  (TR. 52) In August 2003, when the ALJ ruled on Plaintiff's claims, Plaintiff was 54 years of age.  (TR. 16) Plaintiff was married from 1969 to 1979, when the marriage ended in divorce.  (TR. 53) Plaintiff has three adult children. (TR. 110, 113)  As of 1993, Plaintiff had completed four or more years of college.  (TR. 64)

During the Viet Nam War, Plaintiff served in the United States Marine Corps (hereinafter USMC) from December 1, 1968 through December 1, 1970.[2]  (TR. 52)  He served as a rifleman and he saw frequent combat.  (TR. 94)  He fought enemy troops at close range and he lost friends during the fighting.  (Id.)  In March 1969, Plaintiff was seriously wounded "in the explosion of a body [sic] trapped 60-mm mortar round."  (Id.)  He was medically retired from the USMC as a result of his wounds.  (Id.)   Plaintiff received the Purple Heart.  (TR. 79)

After his medical retirement from military service, Plaintiff returned to his hometown of Elkhart, Indiana, where he instantly had difficulty adjusting to civilian life.  (TR. 84)  He states that he "had the label of that crazy Vet returning home."  (Id.)  Memories of Viet Nam "still haunted me and the occurance [sic] of dreams, nightmare [sic], the lack of sleep waived [sic] heavily on my mind and family...It got worse instead of better for me as well as my family as time went on."  (Id.)  His behavior was erratic and he continued to suffer from problems sleeping.  (Id.)  He would "snap out at anyone that crossed [his]...way if any controversy occurred."  (Id.)  His wife and children did not understand.  (Id.)  Plaintiff was unable to seek help from the VA because the closest hospital was four hours away.  (Id.)

Although the record does not reflect Plaintiff's specific work history from 1970 to 1977, the record does reflect that Plaintiff worked at a clothing store as a stock person and manager from 1977 to 1984.  (TR. 59)  His symptoms of PTSD caused him to discontinue working from 1985 through 1989. (TR. 58, 67)  His problems concerned "trust and the idea that people were judging me even after all these years."  (TR. 67)  In 1990, he worked as a school suspension teacher.  (TR. 59, 67)  From October 1991 to June 1992, he worked as a substitute teacher.  (TR. 59)  Plaintiff states that one job involved teaching night school for people studying for their GED. (TR. 67)  "The only good thing about this job was that it was

---

[2]Elsewhere, the record reflects that Plaintiff served in the USMC from June 1968 through October 1969.  (TR. 78, 94)

at night and I could see people coming in and people leaving.  But it still left me on guard all the time." (TR. 67)  His illness caused him to work fewer hours because it was difficult for him to be around people he did not trust.  (TR. 58, 67)

Plaintiff resigned from his last position as a substitute teacher "because of some anger problem with the school administration.  They thought I might bring...out my anger whenever the children got out of hand.  But I never lashed out at any child...I left with a good record....It is not that I do not like being told what to do, rather I know what I am doing and stay away from me and let me do my job.  But when I was faced with someone TELLING me my job, that is where the problem lies.  It was as if they were waiting for me to snap so they could say, hey look, I told you not to hire him."  (TR. 84-85) (emphasis in original) After submitting his resignation in 1992, Plaintiff stopped working altogether  "because the more I was around people the more I di[d] not trust them. Unless they were my family, I wanted just to stay away and to be left alone."  (TR. 58, 67)

In 1991, when Plaintiff moved to Cincinnati, Ohio, he sought help with his condition, by attending group therapy through the Department of Veterans Affairs (hereinafter VA). (TR. 85) "This talking worked for a while, but" he stopped attending because the group did not listen to each other and would "get mad, call eachother [sic] name [sic] for one reason or another and this would turn out to be a zoo." (Id.)

In 1992, Plaintiff moved to Green Valley, Arizona, which was a quieter community made up of older residents.  (Id.)  Plaintiff lived by himself and did not have to deal with people on a daily basis.  (Id.)  He went out only at night.  (Id.)  However, he became more and more depressed; he would become angry at the smallest things; and he could only sleep in half-hour intervals. (Id.)  Additionally, he noticed the sound of helicopters flying near the Mexican border, which was close to his home, "[t]his was not that bad" because the helicopters came infrequently.  (Id.)

In 2001, Plaintiff sought help at the Vet Center in Tucson, Arizona, even though he was still hesitant about group therapy after his experience in Ohio.  (TR. 85, 94) At the Vet

Center, he became a client of James Tillema, MSW, CISW, the Clinic Coordinator. (TR. 85, 94-95) Plaintiff has been receiving medication to assist with sleeping and anger problems through his treatment with Mr. Tillema and other doctors to whom Mr. Tillema has referred him. (TR. 85-86)

Plaintiff's medications include: Oxazepam "to control PTSD"; Bupropion and Fluoxetine for depression; Trazodone and Alprazolam to help with sleeping problems; Hydrocodone for pain. (TR. 63, 92)

B.     Medical evidence

1.     Plaintiff's physicians

The earliest medical record presented is a May 11, 1995 Progress Note from "Southern Arizona HCS" indicating that Plaintiff was "referred by vocational rehabilitation to assess learning disability/immediate memory impairment to assist in vocational planning/rehabilitation training." (TR. 115) Plaintiff was interviewed. (Id.) Testing was initiated. (Id.) Further testing was scheduled for the following week. (Id.)

August 24, 2001 Progress Notes, captioned "General Mental Health Note" from "VAMC Tucson" indicate that Plaintiff was seen by "MHC Gersmeyer N/P" on referral from "Jim Tellema [sic], MSW, CISW at the Vet Center for medication evaluation." (TR. 113) Plaintiff stated: "'I want to get better...don't want to be the Nietnam [sic] Vet who cracked...I'm not crazy.'" (Id.) Plaintiff reported that he slept for only three hours so he was always tired and that "he has anxiety attacks in which he feels he will lose control, increased heart rate & breathing, needs to be by himself. He reports he slows his breathing & 'works with my anxiety'...He goes out in the evening, doesn't like to be around people, has intrusive thoughts, sweats, memories, hypervigilant....Triggers include rain storms, loud noises, helicopters. He stays to himself." (Id.) Plaintiff also stated that his alcohol intake includes "7/7 3-4 times /week, 1-2 Bloody Marys on Sunday." (Id.) The Note also reflects that Plaintiff was tearful during the interview and that he was diagnosed with PTSD "in Cinncinnati [sic] VA in'91." (Id.) The Assessment was PTSD. (TR. 114)

A September 7, 2001 Psychiatry Resident Progress Notes reflects that Plaintiff saw James Rougle, D.O., at "VAMC Tucson."  (TR. 110-113) Plaintiff stated that he suffered from flashbacks of Viet Nam combat, which he did not want to talk about and that he also suffered from poor sleep as he only slept three to five hours per night.  (TR. 110) Plaintiff also told Dr. Rougle that he had not been able to complete school or socialize with anyone besides a few intimate friends.  (Id.)  Plaintiff stated that "he's been more anxious and 'on-guard' with others, thinking that they might e [sic] trying to harm him or that if they move too quickly or make too much noise he has to worry about 'seeing VN again.'" (Id.)  "Besides a drink of '7 and 7' 3-4 times a week, denies the use of alcohol or illicit substances."  (Id.) Plaintiff "receives $1000 disability for wounds received in VN."  (Id.)

Dr. Rougle noted that Plaintiff had shrapnel in his right eye.  (Id.)  Dr. Rougle indicated: "Service Connected Status: 50% to 100%."  (Id.)     Additionally, Dr. Rougle identified the following "Active Problem[s]:"

    PTSD 309.81 08/29/2001 Chorebanian, Mark
    Retinal Scar Peripheral 362.64 08/30/2000 Song, Huey-Fen
    Pseudophakia V43.1 08/30/2000 Song, Huey-Fen
    Skin Sensation Disturb 782.0 07/29/1999 Kolb, Maura A
    Plantar fibromatosis * (ICD-9-CM 72 04/08/1999 [sic] Chorebanian, Mark

(TR. 111)

Dr. Rougle's "Mental Status Examination (Brief)" indicated:

    Neatly dressed, wearing baseball cap.  Normokinetic, good eye contact; mood 'nervous.'  Requests that door be kept open during the interview.  Tps linear; TC neg. SI/HI.  Mild paranoid ideation.  Insight fair, judgment re. seeking med. attn. good.

(Id.)  Dr. Rougle's assessment was:

    51yo AAM w/ h/o of PTSD s/s presents w/ s/s consistent w/ the disorder, viz. flashbacks, hypervigilence and sympath. responsiveness. [Illegible] with efforts [sic] to avoid people/places/conversations about the events. Has become more socially isolative and less interested in planning for the future.  Also endorses depressive s/s re. sleep, appetite, concentration, energy, guilty.  No panic d/o evident.  Also no SAA, psychosis apparent.  Pt. not apparent DTS/DTO at this time. C/o sedation most likely 2nd to recently prescribed BZD; some increased tremor/anxiety may be 2nd to too abrupt titration of bupropr.

(Id.)

- 7 -

Dr. Rougle's diagnosis was:

DX I PTSD, chronic; MDD chronic II deferred; III see problem list; IV social isolation, chronic mental illness, financial stressors; V GAF 45.[3]

(Id.)

Dr. Rougle prescribed the following medication:

Advised pt. to take buproprion only twice a day...to help w/ tremor, nervousness.  Also recommended holding a.m. dose of oxazepam and trying to use only single dose at qhs.  Advised him of synergistic effects of BZD and alcohol, cautioning him to be aware of possible impairment re. driving, machinery, etc.

(TR. 112)

Plaintiff saw Dr. Rougle again on October 26, 2001.  (TR. 108-109) Dr. Rougle's Psychiatry Progress Residency Note reflects that Plaintiff reported having good results with the medications and sleeping.  (TR. 108) He reported that weekly counseling sessions were helpful and he was going to try group counseling although he was somewhat nervous about it.  (Id.)

Dr. Rougle's Mental Status Exam indicated:

Pt. was neatly dressed.  Good eye contact, normokinetic.  Sp. @ n1. r/r/v. Affect nervous; asked to open vertical blinds so he could see out and not "feel so closed in."  Mood "somewhat edgey."  Tps linear; TC neg. for SI/HI.  I/J good.

(Id.)

Dr. Rougle's diagnosis was:

I:       PTSD
II:      deferred
III:     chronic mental illness, poor social support
IV:     GAF 45

(TR. 108-109) Plaintiff was willing to change the timing of his medication.  (Id.)

Dr. Rougle noted that Plaintiff was unwilling to try SSRI "b/c of possible sexual side effects.   Also concerned that changing meds might interfere w/ effects of trazodone/oxazepam."  (TR. 109)

---

[3]GAF stands for "Global Assessment of Functioning" (hereinafter GAF).

At a December 17, 2001 appointment with Dr. Rougle, Plaintiff stated that he had recently moved to Tucson and he was living in an apartment that had more noise than his residence in Green Valley. (TR. 106) Plaintiff "[t]hought that he had to 'watch things' so that he would start to feel comfortable. Even so, felt he was adapting OK." (Id.) He was continuing to go out to dinner at least once a week with his girlfriend. (Id.) He was also attending PTSD counseling with good results. (Id.) He complained of being tired because he was only sleeping three to four hours per night. (Id.) Although the medication initially helped him to increase his sleep time to five hours, "the effects may have lessened." (Id.)

Dr. Rougle's brief mental status examination indicated:

> Wel-groomed [sic]. Good eye-contact; normokinetic. Affect slightly anxious; asked to have blinds open so he wouldn't feel 'trapped.' Mood 'nervous.' Tps linear; TC neg. SI/HI. Some paranoid ideation. No VAH. I/J fair.

(Id.)

Dr. Rougle's assessment reflected that:

> Pt. is fairly stable w/ constant mild paranoia and anxiety. Recent move to Tucson has increased his stressors, but seems to be handling the transition. Suspicious about med changes so will suggest such changes gradually.

(TR. 107)

Dr. Rougle's diagnosis was:

> I:    PTSD; MDD
> II:   DEFERRED
> III:  SEE PROB. LIST ABOVE[4]
> IV:   chronic mental illness, recent move
> V:    GAF 45

(Id.)

On December 19, 2001, Plaintiff called Dr. Rougle to inquire about medication dosage and to complain about continued insomnia. (TR. 105) Dr. Rougle recommended a change in the dosage of Plaintiff's medications. (Id.)

---

[4]The Active Problem list indicates the following in chronological order of diagnosis: anemia, PTSD, retinal scar peripheral, pseudophakia, skin sensation, plantar fibromatosis. (TR. 106)

A January 16, 2002 Psychiatrist Note indicates that Plaintiff saw Christopher Petro, M.D., of the VA Mental Health and PTSD Clinic, where Plaintiff complained about continuing problems with insomnia. (TR. 103-104) Dr. Petro assessed Plaintiff as suffering from PTSD, with continued insomnia. (Id.) He continued Plaintiff on Bupropion and Trazodone. (TR. 103)

On February 28, 2002, James Tillema, MSW, CISW, who is the Clinical Coordinator at the Tucson Vet Center wrote a letter "To Whom It May Concern" in support of Plaintiff's claim for service connected disability benefits for PTSD. (TR., 101) Mr. Tillema indicated that Plaintiff has been his client since June 2001 and that Plaintiff has been receiving psychiatric counseling and medication for the treatment of PTSD. (Id.) Mr. Tillema stated that Plaintiff presents the following symptoms of PTSD: "occasional nightmares, flashbacks, intrusive thoughts, social isolation, constricted emotional rage, hypervigilence, exaggerated startle response, physiologic reactivity, disturbed sleep and problems modulating anger. In addition to PTSD symptoms, he meets the diagnostic criteria for Major Depressive Disorder." (Id.) Mr. Tillema stated that Plaintiff developed PTSD subsequent to his tour of duty in the USMC where he experienced combat and was seriously wounded resulting in Plaintiff's medical retirement. (Id.) Mr. Tillema concluded that Plaintiff's "PTSD has contributed to serious impairment of his functioning in occupational, family and social roles with a GAF score in the 40-45 range. His symptoms have persisted in spite of various treatment interventions and are likely to permanent [sic] in nature." (TR. 102)

On September 3, 2002, Mr. Tillema sent a letter to the SSA that is similar to his February 28, 2002 letter. (TR. 94-95)

2.      State-Agency Consultative and Non-Examining Physicians

On June 12, 2002, State Agency consultant Hubert Estes, M.D., completed a Psychiatric Review Technique form, in which he opined that there was insufficient evidence of a medically determinable impairment from the alleged onset date to the date last insured. (TR. 116)

Dr. Estes' Psychiatric Review Technique form bears a stamp indicating that on September 6, 2002, Paul Tangeman, Ph.D., Psychologist "reviewed all the evidence in file and the assessment of 6/12/02 is affirmed as written."[5]  (Id.)

### C.     Disability Ruling from the Department of Veterans Affairs

On March 21, 2002, Plaintiff filed a claim with the Department of Veterans Affairs for individual unemployability, and service connection for PTSD. (See TR. 78) Service connection is granted for a disease or disability that began in military service or was caused by some event or experience in service.  (Id.)  Based upon a VA examination, Plaintiff was found to be suffering from severe social impairment due to his PTSD.  (TR. 79) Therefore, on October 8, 2002, the VA granted him: (1) Service Connection for PTSD with an evaluation of 70% effective March 21, 2002, the date of his application for benefits; and (2) 100% entitlement to individual unemployability also effective as of March 21, 2002.  (TR. 78-80)

In rendering its decision, the VA stated that:

> At the [VA] examination you reported experiencing alarm reactions, and flashbacks in regards to threatening situations you experienced in Vietnam. You reported that you have no friends, and that you never go around crowds. You stated you did not want to have any close friends because you did not want to be taken advantage of.  Your objective examination findings revealed that you showed to be easily on the verge of tears, and you displayed a defensive behavior.  There was no evidence of psychosis.  The examiner diagnosed post traumatic stress disorder, chronic, severe; and noted you were competent to manage your own funds.  The examiner assigned a global assessment of functioning score of 40 for the current and past year.

(TR. 79)

Regarding Plaintiff's entitlement to individual unemployability, the VA further stated:

> We have granted a total service connected evaluation for individual unemployability because you are not able to remain employed as a result of your service connected disabilities, currently evaluated at 90 percent disabling. The medical evidence shows you have severe complications due to your service connected disabilities.  The evidence also shows that you have not worked since 1990.  We have granted entitlement to this benefit from March

---

[5]The text in quotations, except for the date June 12, 2002,  is stamped onto Dr. Estes' form.

21, 2002, which is the date you file [sic] your claim for individual unemployability.

(TR. 80)

D.      Other statements in the record

A March 20, 2003 Report of Contact with Plaintiff completed by F. Parvello of the SSA indicates that Plaintiff "is a little hard to understand over the phone and states he doesn't go out of the house."  (TR. 33)

On April 17, 2002, F. Parvello conducted a face-to-face interview with Plaintiff.  He indicated that Plaintiff had difficulty reading, talking, and seeing.  F. Parvello wrote that Plaintiff "said he is almost blind in his R eye.  He speaks very soft. [sic]" (TR. 70)

E.      The ALJ's Findings

1.      Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process. 20 C.F.R. §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step requires a determination of whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c), 416.920(c).  In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities.  *Id.*  If the ALJ concludes that the impairment is not severe, the claim is denied.  *Id.*  If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to

be disabled and no further inquiry is necessary.   If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.   The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC")[6] to perform past work.   20 C.F.R. §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.   *Id*.  However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.  20 C.F.R. §§ 404.1520(f). 416.920(f). At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA. *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).  The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations. *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply.  *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five.  *Desrosiers,* 846 F.2d at 580.

2.      The ALJ's decision in Plaintiff Sheppard's case

In the August 19, 2003 decision denying Plaintiff's application for benefits, the ALJ made the following findings:

1.      The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits that are set forth in section  216(i) of the Social Security Act and is insured for benefits through December 31, 1992.

---

[6]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 C.F.R. § 404.1545.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant currently has the following medically determinable impairment(s): post traumatic stress disorder and major depressive disorder.

4.    The claimant did not have any impairment or impairments that significantly limited his ability to perform basic work-related activities prior to December 31, 1992; therefore, the claimant did not have a severe impairment prior to December 31, 1992 (20 CFR § 404.1521).

5.    The claimant was not under a "disability" as defined in the Social Security Act, at any time on or before December 31, 1992 (20 CFR § 404.1520(c)).

***

It is the decision of the Administrative Law Judge that, based on the application filed April 17, 2002, the claimant is not entitled to a period of disability or Disability Insurance Benefits under Sections 216(i) and 223, respectively, of the Social Security Act.

(TR. 16-17)

In reaching her conclusion, the ALJ pointed out the lack of information in the record indicating that Plaintiff received psychiatric or psychological treatment prior to the date he was last insured. "Therefore, there is insufficient evidence to show that the claimant was sufficiently impaired, prior to December 31, 1992, to limit his ability to perform the basic mental functions of normal work activity." (TR. 15) The ALJ stated that although Plaintiff claimed his symptoms started upon his retirement from the military in 1969, he did not seek medical help or therapy until well after 1992. (TR. 16) However, the ALJ acknowledged that Plaintiff attended group therapy in 1991. (Id.) The ALJ stressed that Plaintiff "worked all of 1991 and most of 1992" and that Plaintiff "had some 20 years of substantial work activity after his military discharge." (Id.)

The ALJ discounted Mr. Tillema's findings that Plaintiff suffered from PTSD and major depressive disorder for the reason that "Mr. Tillema made no comment as to whether these conditions existed on the alleged onset date of December 1, 1992, or on the date-last-insured of December 31, 1992, or about the severity of these conditions prior to December 31, 1992." (TR. 16)

- 14 -

The ALJ attributed "no weight" to the VA disability decision as follows: "Although the Veterans Administration Rating Decision may reflect strongly on the claimant's current disability, it can be given no weight regarding the claimant's disability prior to December 31, 1992, the last date the claimant met the insured status requirements for disability insurance benefits." (Id.)  The ALJ also stated that the VA decision "establishes that the claimant's impairments are 'service connected', and not caused by other factors, but does not require a determination of whether the claimant had a 'severe medically determinable impairment,' as defined [in the social security regulations]..., prior to the date of the claim for veterans disability benefits, or March 31, 2002." (Id.)

## III.    ARGUMENT

Plaintiff argues that the ALJ's decision involved numerous errors and he requests that the Court remand his case for further development including a hearing before the ALJ. Plaintiff argues that the waiver of his right to be present at the hearing before the ALJ was defective because he was not advised that he needed to prove he was disabled on or before December 31, 1992.  He stresses that the ALJ erred by not holding a hearing which would have allowed her to question him about whether he was disabled as of December 31, 1992, nor did the ALJ ask Plaintiff to supply lay witness statements that could have shed light on the issue. According to Plaintiff, "[t]hese failures violated [the ALJ's] duty to scrupulously and conscientiously probe into, inquire of, and explore for all of the relevant facts." (Plaintiff's Motion, pp. 7-8)

Plaintiff also argues that: (1) the ALJ erred when she failed to contact the treating doctors and psychologists from the VA to make inquiries about whether Plaintiff's mental health limitations would have dated back to the date last insured; and (2) the ALJ failed to comply with Social Security Ruling (hereinafter SSR) 83-20 addressing determination of onset date, which requires consideration of several factors and which Plaintiff contends the ALJ herein did not consider.  Plaintiff also points out that the ALJ failed to comply with the provision of SSR 83-20 that requires an ALJ to call on the services of a medical advisor

when onset must be inferred.  Further, according to Plaintiff, the ALJ erred by making no finding as to his credibility.  "Given the fact that the ALJ found that Sheppard currently had PTSD and major depressive disorder, his mental impairments could have been related back to December 1992 if the ALJ had followed the procedures outlined in SSR 83-20.  A claimant's credibility is a critical factor in that process.....Thus the ALJ erred in failing to make a finding at all on Sheppard's credibility."  (Plaintiff's Motion, p. 13; *see also* Plaintiff's Reply, p. 7 quoting SSR 96-7p).

Defendant contends that Plaintiff's waiver of hearing was not defective.  Defendant further contends that Plaintiff failed to provide medical evidence sufficient to meet his burden of establishing that his alleged disability began on or before December 31, 1992.  (Defendant's Cross-Motion for Summary Judgment, pp. 4-5).  According to Defendant, the ALJ was not required to obtain retrospective diagnoses from VA providers because such diagnoses would be speculative given that the VA providers had no personal knowledge of Plaintiff's condition prior to his date last insured.

Defendant also argues that the issue of onset date is relevant only when the ALJ finds that the plaintiff was in fact disabled and the ALJ herein did not find that Plaintiff was disabled.  Further, according to Defendant, the ALJ was not required to make a finding regarding Plaintiff's credibility because such a finding would only be required if Plaintiff had established a medically determinable impairment prior to December 31, 1992, which he did not do here.

## IV.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 423(d)(1)(A), an insured individual is entitled to disability insurance benefits if he or she demonstrates, through medically acceptable clinical or laboratory standards, an inability to engage in substantial gainful activity due to a physical or mental impairment that can be expected to last for a continuous period of at least twelve months.  The Ninth Circuit has stated that "'a claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person

cannot engage in any other kind of substantial gainful work which exists in the national economy.'" *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

Pursuant to 42 U.S.C. §405(g), the findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing Desrosiers, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019. A denial of Social Security benefits will be set aside if the Commissioner fails to apply proper legal standards in weighing the evidence even though the findings may be supported by substantial evidence. *Winans,* 853 F.2d at 644.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.* However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence

that supports as well as detracts from the examiner's conclusion. *Id.* at 1156. Moreover, "if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney,* 981 F.2d at 1019

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Magallanes,* 881 F.2d at 751. Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Magallanes*, 881 F.2d at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted). However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

## V.    DISCUSSION

On October 8, 2002, the VA granted Plaintiff a 100% entitlement to individual unemployability effective as of March 1, 2002, i.e. the date that Plaintiff applied for such benefits.   (TR. 78–80) The VA decision was based on the finding that Plaintiff was diagnosed as having "post traumatic stress disorder, chronic, severe." (Id.)  The VA also found that Plaintiff had a "global assessment of functioning score of 40 for the current and past year"; that Plaintiff's disability was connected to his service in the Marine Corps from June 1968 through October 1969; and that "[t]he evidence also shows that [he has]...not worked since 1990." (Id.)

The Ninth Circuit has held that "in a S[ocial] S[ecurity] D[isability] case an ALJ must ordinarily give great weight to a VA determination of disability....The ALJ may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." *McCartey v. Massanari,* 298 F.3d 1072, 1076 (9th Cir. 2002) (recognizing "the marked similarity between these two federal disability programs" including criteria for analyzing disability claims). The ALJ herein did not dispute the VA's disability finding. In fact, the ALJ specifically found that Plaintiff "currently has the following medically determinable impairment(s): post traumatic stress disorder and major depressive disorder." (TR. 17) Instead, the ALJ gave "no weight" to the VA decision for the sole reason that the decision did not address whether Plaintiff was disabled on or before December 31, 1992, his date last insured for purposes of social security disability. (TR. 16)

The record reflects a disability finding by the VA which must be accorded great weight given that the ALJ did not set out persuasive, specific, and valid reasons for discounting such finding. *See McCartey,* 298 F.3d at 1076. Hence, the question here concerns whether the ALJ's finding regarding disability onset date was erroneous. It is well-settled that "[t]he significant date for disability compensation is the date of onset of the disability rather than the date of diagnosis." *Morgan v. Sullivan,* 945 F.2d 1079, 1081 (9th Cir. 1991). "'The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations.'" *Herrera v. Barnhart,* 379 F.Supp.2d 1103, 1107-1108 (C.D. Cal. 2005) (quoting SSR 83-20; *Morgan,* 945 F.2d at 1081).

The instant record contains no medical evidence contemporaneous with Plaintiff's alleged onset date. Under these circumstances, it is not an easy task to determine the onset date given the lack of medical records and the fact that Plaintiff's alleged onset date and the date last worked are far in the past. *See Carr v. Sullivan,* 772 F.Supp. 522, 528 (E.D. Wash. 1991) ("While the task may be difficult, onset date may appropriately be inferred based upon reports obtained subsequent to that date"). Where the record is ambiguous as to onset date,

"SSR 83-20[7] requires that the ALJ create a record which forms a basis for that onset date. The ALJ can fulfill this responsibility by calling a medical expert or where medical testimony is unhelpful exploring lay evidence including the testimony of family, friends or former employers to determine the onset date." *Armstrong v. Commissioner,* 160 F.3d 587, 590 (9th Cir. 1998); *see also Flaten v. Secretary,* 44 F.3d 1453, 1461 n.5 (9th Cir. 1995) (in context of determining onset date of continuously existing disability, "[r]etrospective diagnoses by treating physicians and medical experts, contemporaneous medical records, and testimony from family, friends, and neighbors are all relevant.") Where "the ALJ has created a record and has a basis for selecting an onset date, the claimant who wishes to challenge that date bears the burden of proof." *Armstrong,* 160 F.3d at 590

> SSR 83-20 states in pertinent part:
>
> [i]n determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available.... [T]he established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.
> ....
> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

*Id.* (quoting SSR 83-20)   Indeed, "[i]f the 'medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination.'" *Id.* at 590 (remanding case "to the ALJ with instruction to call a medical expert to determine when [plaintiff] became disabled" because the record

---

[7]"Social Security Rulings constitute the Social Security Administration's interpretations of the statute it administers and of its own regulations....Although Social Security Rulings do not have the force of law,...once published, they are binding upon ALJs and the Commissioner." *Herrera,* 379 F.Supp.2d at 1108 n.5 (citations omitted).

was "unclear" as to onset date) (quoting *DeLorme v. Sullivan,* 924 F.2d 841, 849 (9th Cir.
1991); *see also Morgan*, 945 F.2d 1079 (same).

Here, the ALJ did not determine a specific onset date. Instead, she found that
Plaintiff was not disabled on or before December 31, 1992. Inherent in such a finding is the
ALJ's determination that Plaintiff's disability onset date did not occur on or before December
31, 1992. The ALJ's finding is not supported by substantial evidence in the record.

Although there was no clear evidence in the record establishing the date of onset, the
ALJ did not comply with SSR 83-20 by calling on a medical expert or exploring lay
evidence. Instead, the ALJ relied on the lack of medical evidence and the record of
Plaintiff's work history, both of which do little to support the ALJ's conclusion on the instant
record. Regarding the lack of medical evidence, the ALJ stated that Plaintiff "did not receive
therapy or medical help until well after 1992." (TR. 16) This statement is undercut by the
ALJ's acknowledgment that Plaintiff did attend group therapy sessions as early as 1991.
(TR. 16) The record reflects that these group therapy sessions were through the VA in
Cincinnati, Ohio. (TR. 84-85) Additionally, a 2001 record from the VA Medical Center in
Tucson, Arizona, indicates that Plaintiff "was diagnosed with PTSD in Cinncinnati [sic] VA
in '91." (TR. 113)

Records from the VA Medical Center in Tucson, Arizona, also establish that from the
time Plaintiff sought treatment beginning in 2001, he was diagnosed with PTSD and that
diagnosis continues throughout the record. (TR. 101-102, 103-104, 106-107, 108-109, 110-
112) Additionally, as of August 29, 2001, VA doctors determined that Plaintiff's GAF rating
was "45." (TR. 111) The GAF rating is "used by mental health professionals to rate the
patient's psychological, social and occupational functioning...A rating of '45' represents a
'serious impairment in social, occupational or school functioning' such as the inability 'to
keep a job.'" (Plaintiff's Motion, p. 8 quoting *Diagnostic and Statistical Manual of Mental
Disorders,* (Fourth edition, Text Revision 2000) (hereinafter *DSM-IV*) at 32-34) The GAF
rating of 45 continues in the VA medical records through December 2001. (TR. 107, 109,

111) The 2002 VA disability determination assigned Plaintiff a lower GAF rating of 40, which signifies "[s]ome impairment in reality testing or communication...OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work...).  (TR. 78-80); *DSM-IV,* p.32.  Such findings are consistent with Plaintiff's statements in the record concerning how PTSD has affected his interaction with others and his ability to work since his return to civilian life.

The ALJ discounted the 2001 and 2002 diagnoses made by the Arizona VA physicians because they did not indicate that Plaintiff's conditions existed on the alleged onset date or on the date last insured; nor did they comment on the severity of the impairments prior to the date last insured.  (TR. 16)  That the evaluations on record did not take place until 2001 and 2002 does not necessarily mean that onset of Plaintiff's disability was subsequent to December 31, 1992.  *See Armstrong,* 160 F.3d at 590 (Although the plaintiff was not diagnosed until after the date last insured, his mental impairments "could have been disabling long before that time" and therefore the ALJ should have called a medical expert to assist in determining onset date).

The ALJ also cited the fact that Plaintiff "had some 20 years of substantial work activity after his military discharge" and that his earning records showed that he worked all of 1991 and most of 1992.  (TR. 16)  The earning records indicate income generated from 1966 to 1984 and from 1990 to 1992.  (TR. 55-56)  When Plaintiff was asked to list his work history for the past fifteen years, he indicated that he worked from 1977 to 1984, 1990, 1991, and 1992.  (TR. 59)  The record also contains Plaintiff's statements regarding his difficulty working due to his symptoms associated with PTSD; that his symptoms caused him to stop working altogether from 1985 to 1989; and that he ultimately stopped working in 1992 for the same reason.  (TR. 67; see also TR. 58, 84-85)  Such testimony is consistent with the diagnosis of PTSD and Plaintiff's GAF rating.  In fact, the ALJ found that Plaintiff "has not engaged in significant gainful activity since the alleged onset of disability", i.e, since

December 1, 1992.  (TR. 15, 17) Therefore, although the ALJ correctly pointed out that Plaintiff worked for twenty years after his medical discharge from military service, such a finding when taken in context of the record as a whole, does not support the conclusion that Plaintiff was not disabled as of December 31, 1992 within the meaning of the Social Security Act.

Although Plaintiff is not relieved of his "ultimate burden to prove disability before expiration of disability insured status,...SSR 83-20...requires that the ALJ assist the claimant in creating a complete record" instead of "just inferring an onset date, which would deny a claimant benefits." *Armstrong,* 160 F.3d at 590.  The ALJ herein was charged with the difficult task of determining the date of onset of Plaintiff's disability without the benefit of medical evidence concurrent with Plaintiff's alleged onset date.  Nonetheless, where the record, as here, indicates that the ALJ has failed to comply with SSR 83-20 and where the record, as here, remains unclear when the plaintiff's disabilities became disabling, the Ninth Circuit has remanded the action to the ALJ for further development in compliance with SSR 83-20.  *Id.* at 591 (remanding with "instruction to call a medical expert to determine when [the plaintiff] became disabled."); *see also Morgan*, 945 F.2d 1079 (reversing in part an ALJ's determination of the onset date of mental disorders without the assistance of a medical expert); *Herrera,* 379 F.Supp.2d at 1109 (remanding because "the ALJ made the inference regarding the date of onset in favor of the government without the expertise of a medical advisor, required by SSR 83-20" and thus the determination was made without a "legitimate medical basis").

Every substantive  argument advanced by the parties depends upon Plaintiff's disability onset date.  That date is unclear on the instant record and requires further development consistent with SSR 83-20. *See Id.*  Plaintiff's request for remand should be granted so that the ALJ can "create a record which forms the basis for... [the] onset date." *Armstrong,* 160 F.3d at 590.  On remand, Plaintiff, who is now represented by counsel, should be given the opportunity to appear before the ALJ and to further supplement the

record to shed light on the disability onset date.  *See e.g. Flaten,* 44 F.3d at 1461 n.5 (recognizing relevance of retrospective diagnoses by treating physicians and medical experts, contemporaneous medical records and lay testimony to establish disability onset date); *Smith v. Bowen,* 849 F.2d 1222, 1225 (9th Cir. 1988) (retrospective medical records are acceptable for use in determining disability onset date); *Bilby v. Schweiker,* 762 F.2d 716 (9th Cir. 1985) (same).

Plaintiff's argument that the ALJ failed to make specific findings regarding his credibility, SSR 96-7p, addresses "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements," and provides in pertinent part that:

> [n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

SSR 96-7p. On August 19, 2003, the ALJ herein found that Plaintiff "currently has the following medically determinable impairment(s): post traumatic stress disorder and major depressive disorder."  (TR. 17) Moreover, the VA found that Plaintiff was disabled as of March 2002 due to PTSD.  (TR. 78-83)   Accordingly, the record does reflect medical evidence of medically determinable mental impairments.  What is uncertain is the onset date of Plaintiff's impairments.  The record contains Plaintiff's subjective complaints of disabling symptoms prior to the expiration of his date last insured.  As set forth above, the ALJ has failed to create a record to support her conclusion that the onset of Plaintiff's disability did not fall within Plaintiff's insured status.  On remand, the ALJ should evaluate Plaintiff's credibility in light of the further development of the record.

VI.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the District Court: (1) grant Plaintiff's Motion for Summary Judgment (Doc. No. 5), construed herein as a Motion to Remand, and remand the action for further development consistent with this

Report and Recommendation; and (2) deny Defendant's Cross-Motion for Summary Judgment (Doc. No. 12).

Pursuant to 28 U.S.C. §636(B), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation.  If objections are filed, the parties should use the following case number: CIV 04-501-TUC-JMR.

If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

The Clerk is directed to send a copy of this Report and Recommendation to the parties and/or their counsel.

DATED this 28th day of February, 2006.


_____

Héctor C. Estrada
United States Magistrate Judge